BENTON, Judge,
dissenting.
The judge of compensation claims entered an order awarding certain workers’ compen *1235 sation benefits to Donna L. Schnupp and, after the fact, authorizing diagnostic testing (a “discogram”) and back surgery by previously unauthorized physicians. Before the diagnostic testing and surgery, Ms. Schnupp mailed a written request that a particular orthopedic surgeon, Dr. Hogshead, be authorized to treat her and that a discogram be authorized, but she did not request authorization for her surgery until the operation was over.
In response to her initial request for authorization for Dr. Hogshead, the Interlaehen Country Club, the claimant’s erstwhile employer, and FCCI Mutual Insurance Company, the Club’s workers’ compensation carrier, declined to authorize a sixth orthopedist to treat her, and so advised Dr. Hogshead. The request for authorization for a disco-gram, which was not received until after the discogram had been performed, was also denied.
After another physician, a “diagnostic in-terventional radiologist,” had performed a discogram, Dr. Hogshead did “three level [anterior and posterior spinal] fusion surgery,” without prior notice to the employer or its carrier, and without furnishing them the results of the discogram. No emergency required either the diagnostic testing or the surgery, which the judge of compensation claims explicitly found to have been elective. The employer and its insurance carrier contend that it was error to authorize the disco-gram and the surgery retroactively. I agree with their contention and would reverse on that basis.

Low Back Pain

While working as a waitress at the Interla-chen Country Club on April 5, 1992, Ms. Schnupp reported low back pain after lifting a cooler and its contents onto a dolly. On April 16, 1992, she went to see Dr. Mayer, who raised the possibility of a fracture of the coccyx, and referred her to Dr. MeCutchen, an orthopedic surgeon, who first saw her on April 21,1992.
Ms. Schnupp complained of pain and numbness in her left leg down to her toes. A scan seemed to Dr. MeCutchen to show a right central and lateral area of mild or moderate herniation on a lumbosacral disc. Dr. MeCutchen believed that Ms. Schnupp had a herniated disc at the L5-S1 region but was “not sure why it appears to be right-sided on the CT and her symptoms were left-sided.” Dr. MeCutchen, who placed Ms. Schnupp on steroids and anti-inflammatories, did not believe that Ms. Schnupp’s coccyx had a lesion.
Ms. Schnupp was seen again on April 28, 1992. At that time she reported occasional pain to the right leg but more pain to the left side. By May 7, 1992, she reported more right-side pain than left. On May 21, 1992, she reported that her symptoms were primarily right-sided. Dr. MeCutchen referred her to Dr. Munson, another orthopedic surgeon, who first saw her on May 22, 1992.
Dr. Munson noted that Ms. Schnupp did not have a severe disc extrusion and that her clinical findings seemed to be mild. On June 23, 1992, Ms. Schnupp still reported pain. Dr. Munson ordered magnetic resonance imaging (MRI) with a view toward possible surgery. But the MRI revealed “absolutely no disc herniation and, in fact, a normally hydrated disc at L5-S1.” Dr. Munson concluded that the MRI results “would tend to negate her CT findings of a suggestion of a herniated disc at L5-S1 on the right,” and advised:
I certainly could recommend no surgical intervention based on this inconsistency. She still has some mildly positive right leg symptoms. She does say that initially she did have some pain in her left leg. Her nerve tension signs seem to remain somewhat positive on the right and negative on the left but certainly inconsistent with any findings on her MRI. My advice would' be a trial of epidural steroids rather than surgical intervention. Certainly if conservative measures here did not provide her any improvement, my advice would be a myelogram enhanced CT scan to further clarify the issue here.
On deposition, Dr. Munson explained that Ms. Schnupp’s “symptoms were in excess of what could be explained by any of the diagnostic tests, and there was no — there was simply nothing to fix.” Dr. Munson also *1236 referred Ms. Sehnupp to Dr. Hollifield, a neurosurgeon.
On August 6, 1992, Dr. Hollifield evaluated Ms. Sehnupp. Dr. Hollifield noted that Ms. Schnupp’s “general exam was unremarkable,” and that the “MRI [wa]s really unimpressive to my review.” Dr. Hollifield ordered a myelogram and CT scan in an attempt to ascertain Ms. Schnupp’s situation. On August 25, 1992, Dr. Hollifield noted:
Myelogram and CT scan show really insignificant findings of a very small disc herniation on the left of the midline at L5-6. The patient complaints are of right leg pain at present and I see nothing to explain this. I feel that she deserves a tr[ia]l of physical therapy and I would like to check her back in three weeks.
On November 4,1992, Dr. Hellinger, another neurosurgeon, performed an independent medical examination. Dr. Hellinger opined on deposition that Ms. Sehnupp was not a surgical candidate, that she had reached maximum medical improvement when he saw her and that she had a zero percent impairment rating with no restrictions.
Ms. Sehnupp continued to see Dr. Holli-field through January 4, 1998, at which time Dr. Hollifield noted that Ms. Schnupp’s “clinical examination [wa]s really without deficit.” Dr. Hollifield had maintained that Ms. Sehnupp was not a surgical candidate because “[h]er study suggested] a very small left L4-5 disc herniation and certainly d[id] not explain her right sided pain.” Dr. Holli-field ordered an MRI of the thoracic area to rule out any possible pathology further up the spine and noted that if this was negative he had little else to offer her and would refer her back to Dr. Mayer.
On February 24, 1993, Dr. McBride, an orthopedic surgeon, performed an independent medical examination. Dr. McBride’s notes indicate that the thoracic MRI was performed and was “unremarkable except for mild scoliosis.” Dr. McBride reviewed Ms. Schnupp’s myelogram, CT scan and MRI, which did “not show any overwhelming evidence of nerve root entrapment, disc herniation or central canal stenosis.” Dr. McBride, who was “somewhat at a loss to explain her symptoms,” surmised that her pain might be originating from some other source and ordered a bone scan. On March 1, 1993, Dr. McBride received the results of the bone scan and noted that they were normal. On March 8, 1993, Dr. McBride placed Ms. Sehnupp on anti-inflammatories. Dr. McBride also recommended trigger point injections, which Ms. Sehnupp declined.
Next Ms. Sehnupp requested, and the employer and its carrier authorized, Dr. Uric-chio, a board-certified orthopedic surgeon, who saw Ms. Sehnupp on June 2, 1993. Dr. Uricchio reviewed her prior tests which he found to reveal “only minimal degenerative changes easily compatible with her age,” and to show no evidence of disc herniation or of pressure on the nerve root. Dr. Uricchio also performed a sensory deficit pinprick test, which revealed no pressure on any nerve. On deposition, Dr. Uricchio testified that Ms. Sehnupp “sat on the examining chair with all the weight on her left buttock,” but that “[ljater on the examining table she had all the weight on her right buttock.”
Dr. Uricchio ordered an EMG, which revealed no evidence of acute lumbosacral radi-culopathy, and a thermogram, which was only minimally abnormal, “almost to the point of being equivocal.” Dr. Uricchio concluded that “there was no purely objective evidence to suggest permanent physical impairment if based on demonstrable anatomic change as a direct and specific result of the 4/5/92 incident,” and that he had “very little else to add to this patient’s treatment.” Dr. Uricchio did not believe that Ms. Sehnupp was a surgical candidate.
On August 11, 1993, a petition for benefits was filed seeking authorization for an osteopath to treat Ms. Sehnupp. In a letter dated August 19, 1993, and again in a letter dated September 15, 1993, the employer and its insurance carrier explicitly authorized both an osteopath — who was originally authorized in a form response to the petition for benefits dated August 24, 1993 — and Dr. Hellinger, the neurosurgeon whose previous authorization had been limited to evaluating Ms. Sehnupp, along with Drs. Haddock, Holli-field, McCutchen, and Munson, to provide whatever treatment she needed.

*1237
Unauthorized Physicians

Instead, on October 25, 1993, Ms. Schnupp made her first visit to Howard Hogshead, an orthopedic surgeon in Jacksonville. Ms. Schnupp testified that she went to Dr. Hogshead “under” her husband’s health insurance, without requesting authorization from her employer or its insurance carrier beforehand.[1] Dr. Hogshead concluded that the various tests Ms. Schnupp had undergone ruled out a herniated disk and any significant compression of nerve roots. He testified, however, that he was interested in attempting to find out whether some other “pain generator” was responsible for the pain she reported. On that rationale, Dr. Hogshead ordered a diseogram.
On November 3,1993, Ms. Schnupp mailed a claim for benefits requesting authorization of Dr. Hogshead and authorization for a dis-cogram. Without waiting for a response,[2] Ms. Schnupp kept an appointment with Dr. Spohr, the radiologist to whom Dr. Hogshead had referred her, and the radiologist performed a diseogram[3] on November 5, 1993. By letter dated December 8,1993, Dr. Hogshead was informed: “[Y]ou are not authorized to treat [Ms. Schnupp] under the workers’ compensation system since you have not been authorized by the servicing agent, FEISCO.” By the time authorization for Dr. Hogshead was denied,[4] the following physicians had all been authorized to treat Ms. Schnupp:
Gabriel Mayer, M.D John McCutchen, M.D.
William Hollifield, M.D. Steve Lee, M.D.
Gregory Munson, M.D. David Haddock, M.D.
Sam Stephenson, M.D. Jose Lara, M.D.
Joseph Uricchio, M.D. Clifford Spohr, M.D.
Douglas Conigliaro, M.D. Paul Mori, M.D.
Edwin M. Villalobos, M.D. Kurt Mori, M.D.
Frank Hellinger, M.D. Grady McBride, M.D.
James Hannah, M.D. David J. Rippe, M.D.
Larry Sadler, M.D. Fenton Froom, M.D.
Joseph Nixon, M.D. Din O. Sun, D.O.
On February 15, 1994, without authorization by the employer or its insurance carrier, Dr. *1238 Hogshead performed major surgery, an extensive anterior and posterior reconstruction of the lower back with instrumentation.[5]

After The Fact

On August 19, 1994, Ms. Sehnupp filed a petition for benefits. Among other things, the petition sought authorization for • Dr. Hogshead, and requested total disability benefits. On January 22, 1996, the judge of compensation claims entered an order finding that the employer and its insurance carrier had failed to authorize “alternative care,” and authorizing Dr. Hogshead to treat Ms. Sehnupp, nunc pro tunc. The order also awarded future medical care and treatment, temporary total disability benefits, temporary wage loss benefits, permanent partial wage loss benefits, interest on all past due benefits, $11,500 in taxable costs, and $135,-000 in attorney’s fees.

Employer To Secure Medical Care

The claimant’s employer is under a duty, subject to certain limitations, to “furnish to the employee such medically necessary remedial treatment, care, and attendance ... for such period as the nature of the injury or the process of recovery may require, including medicines, medical supplies, durable medical equipment, orthoses, prostheses, and other medically necessary apparatus.” § 440.13(2)(a), Fla.Stat. (1991). Statutory amendments subsequent to the compensable injury have not altered this duty.[6]
At all times pertinent to the present proceeding, whenever the claimant, having suffered a compensable injury, requested a modality of care not already being provided, the employer was obliged to grant the request or obtain a ruling from the judge of *1239 compensation claims that the care requested by the claimant was not medically reasonable and necessary.
If the employer/earrier fails to provide alternative care or seek a ruling from the deputy commissioner, then the employee may obtain alternative care at the expense of the employer/earrier subject only to reasonableness and necessity. The employee may obtain a ruling on the reasonableness and necessity in advance or seek the alternative care and obtain such ruling after-wards.
Hill v. Beverly Enters., 489 So.2d 118, 121 (Fla. 1st DCA 1986) (orthopedist requested when none authorized); see also Sears, Roebuck and Co. v. Viera, 440 So.2d 49 (Fla. 1st DCA 1983)(holding that, where the employer declined claimant’s request for a specific chiropractor “or [that failing] any other chiropractor chosen by the employer,” the employee was entitled to retroactive authorization of the chiropractor who provided necessary treatment).

Discogram Request Untimely

But the claimant’s “request” for a disco-gram, mailed two days before the procedure was performed, did not allow the employer “a reasonable time period within which to provide the treatment or care.” § 440.13(2)(c), Fla.Stat. (1995)(codifying requirement in existence, although not codified, when disco-gram occurred). Under current law, the carrier is allowed at least three business days after receipt of the request in which to respond, even when an authorized physician makes the request. § 440.13(3)(d) and (i), Fla.Stat. (1995). Applying the statutes in effect when the discogram took place, we held in Borges v. Osceola Farms Co., 651 So.2d 173 (Fla. 1st DCA 1995), that a seventeen-day delay in authorizing requested chiropractic care did not constitute a failure to offer such care.
Here authorization was not requested, in any meaningful sense, before the test was done. The timing of the claimant’s communication also precluded the employer’s exercising its right to “seek a ruling from the [judge of compensation claims]” as to the reasonableness and necessity of a discogram before the fact. Hill, 489 So.2d at 121. By the time the employer’s agent received what the claimant mailed, the discogram was fait accompli.

Surgery Not Requested

The claimant made no request whatsoever for authorization for surgery before the operation took place.[7] Instead, she requested authorization for unspecified services from Dr. Hogshead, the orthopedist in Jacksonville she had already begun seeing.[8] Without *1240 elaboration, this request asserted that she “was not receiving adequate care.” The request made no mention of surgery or any medical specialty. Cf Bay Cadillac, Inc. v. Ingram, 384 So.2d 913 (Fla. 1st DCA 1980)(holding physician authorized to perform electromyographic study was not authorized to render other treatment). This is not a case in which the claimant’s request for a physician amounts to a request for care of a type not previously authorized.[9]
The request for Dr. Hogshead provided no notice that the “claimant was not seeking merely additional care in the same type of treatment regime.” Bradley Constr. v. White, 457 So.2d 547, 550 (Fla. 1st DCA 1984). Authorization for Dr. Hogshead having been denied, the claimant neither turned to another of the phalanx of physicians authorized to treat her — which included five orthopedists and two neurosurgeons — nor sought a hearing before the judge of compensation claims, in order to show, if she could, the medical reasonableness and necessity of adding another orthopedic surgeon to her retinue.

Prior Authorization Required

At no pertinent time could a claimant “absent a medical emergency^[10] arbitrarily *1241 change[] physicians while alternate treatment [i]s still being provided by the employer/carrier and without seeking prior approval by the deputy commissioner.” Delta Airlines v. Underwood, 406 So.2d 1188, 1189 (Fla. 1st DCA 1981); accord Commercial Carriers, Inc. v. Porter, 424 So.2d 155 (Fla. 1st DCA 1982); City of Fort Lauderdale v. Flanders, 416 So.2d 1234 (Fla. 1st DCA 1982)(holding claimant not entitled to reimbursement for cost of back surgery performed by physician who knew he had not been authorized); Mt. Sinai Med. Ctr. v. Lack, 381 So.2d 304 (Fla. 1st DCA 1980); Progress Drilling, Inc. v. Fussell, 377 So.2d 56 (Fla. 1st DCA 1979)(reversing award of benefits for surgery when there was no request that employer provide surgery and surgeon was not authorized as treating physician).
Under current law, when the employer “fails to provide treatment or care ... after request by the injured employee,” § 440.13(2)(c), Fla.Stat. (1995), a claimant is entitled to seek a ruling as to the reasonableness and necessity of medical care, after the fact.[11] Although section 440.13(2)(c), Florida Statutes, has been amended since the date of Ms. Sehnupp’s accident, the procedures set out in the amended statute do not, insofar as material to the present case, embody any change in the parties’ substantive rights as of the date of her accident. In Lakeland Regional Medical Center v. Murphy, 695 So.2d 895 (Fla. 1st DCA 1997), which involved an industrial accident that occurred on January 30, 1995, a request for treatment by one Dr. Gonzalez was held properly deniable and an order requiring that his bills be paid was reversed on grounds that two other physicians had been previously authorized.
If the employer fails to provide treatment or care required by this section after request by the injured employee, the employee may obtain such treatment at the expense of the employer, if the treatment is compensable and medically necessary. There must be a specific request for the treatment, and the employer or carrier must be given a reasonable time period within which to provide the treatment or care. However, the employee is not entitled to recover any amount personally expended for the treatment or service unless he has requested the employer to furnish that treatment or service and the employer has failed, refused, or neglected to do so within a reasonable time or unless the nature of the injury requires such treatment, nursing, and services and the employer or his superintendent or foreman, having knowledge of the injury, has neglected to provide the treatment or service.
The deputy commissioner in Porter ordered the employer or its insurance carrier to pay for elective surgery performed by an unauthorized physician, against the advice of the claimant’s treating physician. We reversed on grounds that, even though the unauthorized physician “offered highly specialized treatment, the treating physician was consulted and recommended against the procedure. This does not constitute failure to provide alternative treatment.” Id. at 156.
If care is already being provided,[12] when the employer or insurance carrier denies authorization for additional care, it is incumbent upon the claimant to seek prior authorization for additional care from a judge of compensation claims. See Chase v. Henkel & McCoy, 562 So.2d 831 (Fla. 1st DCA 1990); Wackenhut Corp. v. Freilich, 464 So.2d 217 (Fla. 1st DCA 1985). “In Porter, the claimant was not seeking alternative treatment as such, but merely additional care. Therefore, he was first required to seek prior approval from the deputy commissioner for the unauthorized care, demonstrating good cause *1242 therefor.” Viera, 440 So.2d at 51. We “ha[ve] consistently held that the E/C is not responsible for treatment of a workers’ compensation claimant by an unauthorized doctor absent a medical emergency where authorized treatment is being provided by the E/C.” Universal Studios v. Roberts, 643 So.2d 1182, 1184 (Fla. 1st DCA 1994); Murphy; Chase; Freilich.
Nothing about the way this case was tried or appealed justifies today’s decision. In Lovell Brothers, Inc. v. Kittles, 518 So.2d 319, 322 (Fla. 1st DCA 1987), “[i]n view of the unique factual situation present [t]here, we conclude[d] that the deputy commissioner did not err in declining to apply th[e] rule [that a claimant must, absent an emergency, obtain judicial approval of a requested but unauthorized physician, when other physicians are authorized].” Mr. Kittles had requested authorization for another doctor, but the employer had refused to authorize the doctor requested or anybody else new. Kit-tles’ authorized doctors all “informed claimant they had no further treatment to offer him.” Id. In those circumstances, the court found the claimant was left with no treating physicians. The present case affords a dramatic contrast.
Ms. Schnupp could have gone to any of the Orlando physicians authorized to treat her, instead of travelling to Jacksonville to be treated by Dr. Hogshead. While Dr. Holli-field opined he had “little else” to offer Ms. Schnupp, no doctor informed Ms. Schnupp that further treatment was unavailable, or declined to see her again. The record contains no indication that she ever went to Dr. Sun’s office; and she never went back to see Dr. Hellinger after he evaluated her, even though he was subsequently authorized to treat her. While independent medical examinations do not constitute alternative care, Colace, 573 So.2d at 997, Dr. Hellinger became a physician to whom Ms. Schnupp could have turned for treatment, once he was authorized to treat her. She simply turned her back on a wide array of physicians authorized to treat her, and did so without articulating a meaningful objection to any of them.
The compensation order awarding indemnity and medical benefits ought to be permitted to stand only insofar as it awards benefits attributable solely to the April 5, 1992 accident; these benefits have not been called into question on appeal. The compensation order awarding indemnity and medical benefits ought to be reversed insofar as it finds the employer or its insurance carrier responsible for costs incurred for treatment (including surgery) that they did not authorize; insofar as Dr. Hogshead was authorized to treat the claimant at appellants’ expense in the future; insofar as it awards future medical, wage loss or disability benefits for treatment, loss or disability attributable to surgery not authorized before the fact; and insofar as it awards appurtenant attorney’s fees and costs.

. Q. Didn’t you, in your deposition, state that you were going to go ahead and go to Dr. Hogshead and put this under your health insurance carrier and then you'd worry about the workers' compensation later?
A. That’s what I said, and my husband also said the same thing.

. The judge of compensation claims found that the claim was received on November 11, 1993. Dated the following day, the notice of denial stated:
1. Dr. Howard Hogshead is not authorized. Claimant has numerous doctors that have authorization to treat claimant and have been treating claimant. 2. Authorization for disco-gram is not reasonable or medically necessary.
3.No costs or attorney fees are due.
On December 8, 1993, a pretrial hearing was held. As issues to be tried, Ms. Schnupp listed authorization of osteopathic and psychological care, permanent total disability benefits since maximum medical improvement, and penalties, interest, costs, and attorney's fees. Authorization for Dr. Hogshead was not then listed as an issue to be tried at the final hearing.
It was also on December 8, 1993, that counsel for the employer and the carrier learned (from claimant’s counsel) that the claimant was continuing to see Dr. Hogshead. That day he sent Dr. Hogshead a letter informing him of the numerous physicians already authorized and advising Dr. Hogshead that he was not authorized to treat Ms. Schnupp.

. The diseogram revealed central annular tears at L4-5 and L5-6 and a small right posterolateral annular tear at L6-S1. Dr. Hogshead diagnosed Ms. Schnupp as having degenerative disc disease.

.At the hearing on October 23, 1995, James Adams, the claims adjuster, testified:
With all due respect to this lady ... we have offered and had given five orthopedics, two neurologists, two physiatrists, an offer of an osteopath. At what point can you come to when you’ve offered enough doctors?
She’s not made any mention in her testimony here today that she disliked or hated any of these doctors or thought that they were idiots or anything. It was only the matter of the fact that she continued because none of them had offered surgical intervention.
[[Image here]]
... [I]f it had been one or two doctors, if they had different opinions, I would have said, Here’s a doctor that says you need an operation, here’s one that says you don’t. Well, then, continue. Obviously, our company wanted to do the right thing because look at all these documents.
[[Image here]]
How far do we go, Your Honor? Do we — do we buy a hospitaI[?] ... I'm not being a smar-tass about this, it’s just that I'm reaching the point to where we go through nine doctors, and the only time — if you — if you look at it, we continue to go with doctors because not one of them says they want to operate. So we go back and what — the reason we offered it was some of these doctors were only IME’s. Go back to them.
She mentioned that Dr. Munson wanted to operate. Go back to Dr. Munson, review everything again. Do you need the operation? I don't think that was unreasonable.

. Evidence as to the efficacy of the procedure was in conflict. Before surgery, Ms. Sehnupp worked as many as twenty hours a week, but she has been unable to work since. On March 4, 1994, Ms. Sehnupp reported having pain only in her lower back. Dr. Hogshead encouraged her to become more active and start walking. By August 19, 1994, Ms. Sehnupp was reported to be rid of some of the pain in her legs, but had a little numbness in one toe and her left foot was warm. Her legs shook when she walked but she felt this was from being "deconditioned.”
On November 4, 1994, Dr. Hogshead's notes indicate that Ms. Schnupp’s work capacity evaluation gave her a "fairly low rating.” The therapist reported to Dr. Hogshead that Ms. Sehnupp could not sit or stand for an entire work day without having to lie down. Dr. Hogshead placed Ms. Sehnupp at maximum medical improvement with a 27)4% impairment rating to the body as a whole.
On March 23, 1995, Ms. Sehnupp filed a claim for permanent total disability benefits from November 4, 1994, to the present and continuing. On July 13, 1995, however, the judge of compensation claims entered an order — at the request of the claimant and over objection by counsel for the employer and the carrier — striking the claim for permanent total disability as not ripe for adjudication.

. By virtue of the date of Ms. Schnupp’s accident, the substantive rights and responsibilities of the parties with regard to medical treatment are delineated in section 440.13(2), Florida Statutes (1991), which also includes certain procedural provisions. See Sullivan v. Mayo, 121 So.2d 424 (Fla.1960).
Effective January 1, 1994, both substantive and procedural provisions of section 440.13 were amended. Ch. 93-415, § 17, at 98, Laws of Fla. Former section 440.13’s procedural provisions apply to matters “involving authorized care antedating the enactment.” Redwing Owner Operators v. Cardenas, 648 So.2d 1205, 1206 (Fla. 1st DCA 1995). As to such matters, what governs is the version of “Section 440.13, Florida Statutes, [in effect] at the time the services in question were provided.” Id. at 1205.
In Southern Bakeries v. Cooper, 659 So.2d 339, 341 (Fla. 1st DCA 1995), we declined to apply section 440.13(5), Florida Statutes (Supp.1994), in proceedings arising from an accident that occurred before January 1, 1994, on grounds that subsection (5) created a new entitlement for claimants — and a new liability for employers — in "giving the claimant the right to select an independent medical examiner and obtain such an examination without having to pay for this service.”
In contradistinction to subsection (5), few, if any, of the newly enacted provisions of section 440.13(3), Florida Statutes (Supp.1994), create new substantive rights. Just as the provisions of section 440.191, Florida Statutes (Supp.1994), requiring requests for assistance are procedural, see Baptist Manor Nursing Home v. Madison, 658 So.2d 1228 (Fla. 1st DCA 1995), so section 440.13(3), Florida Statutes (Supp.1994), is procedural, insofar as it specifies time frames as to, cf. Bell v. University of Fla., 652 So.2d 460 (Fla. 1st DCA 1995), or other procedures for, requests for medical care or treatment. Cf. Town of Jupiter v. Andreff 656 So.2d 1374 (Fla. 1st DCA 1995). The decision in Casa Del Mar v. Schneider, 682 So.2d 146 (Fla. 1st DCA 1996)(rejecting contention that section 440.13(5) applies to treating physicians) does not hold otherwise.

. Compensability was not denied here. Generally, in such circumstances, costs for an unauthorized physician will not be reimbursed (absent an emergency) if authorization for the procedure is not requested beforehand, so that the employer can elect to provide the service or litigate its necessity. See Ramada Inn v. Gates, 418 So.2d 1160 (Fla.App.1982); Universal Studios v. Roberts, 643 So.2d 1182, 1184 (Fla. 1st DCA 1994); Hillsborough County Sch. Bd. v. Brown, 565 So.2d 867 (Fla. 1st DCA 1990); Palm Beach Newspapers, Inc. v. Roston, 404 So.2d 174 (Fla. 1st DCA 1981). Since January 1, 1994, moreover, certain procedures. — among them surgery like Ms. Schnupp underwent — have to be requested ahead of time, even if they are to be performed by an authorized physician. § 440.13(3)(i), Fla.Stat. (Supp.1994).

. Recent statutory amendments have not altered the longstanding rule that a claimant cannot "select and insist upon a treating physician not approved or authorized by the carrier.” Cal Kovens Constr. v. Lott, 473 So.2d 249, 254 (Fla. 1st DCA 1985).
In response to the claimant’s request for certain physicians in Champlain Towers v. Dudley, 481 So.2d 532 (Fla. 1st DCA 1986), the employer and its insurance carrier responded by authorizing others. The claimant responded, "We object to the physicians named,” but did not request additional alternative physicians, going forward instead with treatment by the physicians initially requested.
In reversing the award of the cost of care by these unauthorized physicians, this court stated:
In the context of this case we find that the specific requests for authorization cannot reasonably be regarded as a continuing request intended to accord the carrier its right of initial choice, subject only to a veto to be exercised by claimant in a way which does not effectively transfer initial choice to claimant. Although the statute imposes no requirement that claimant state grounds for objection, it clearly does impose the duty of a continuing good faith request for another authorization, to which carrier must in turn respond with reasonable alternatives until a "deadlock” requires the deputy’s intervention. Communica *1240 tions and actions of the parties in this case ... show claimant's abiding intention to accept only his originally specified choice of caretakers, To effectuate that result at carrier’s cost absent emergency does, under our cases, require an antecedent order by the deputy when claimant’s choice has not in fact been necessitated by carrier’s omission.
Id. at 533-34. Ms. Schnupp evinced an abiding intention to accept only Dr. Hogshead here. She did not even identify his specially in her claim for his services.

. Enactment of chapter 93-415, section 17, Laws of Florida, notwithstanding, the rule regarding requests for different types of medical care remains essentially unchanged (aside from new time requirements). Now as before, it
is well-established that the employer and carrier are responsible for unauthorized medical care in those instances where the claimant has requested a specific type of medical treatment by one of the types of physicians described in section 440.13(l)(f), if it appears that such treatment is reasonably and medically necessary, and the employer and carrier have refused to authorize that type of treatment. Section 440.13(2), Florida Statutes (1985); Fuchs Baking Co. v. Estate of Szlosek, 466 So.2d 415 (Fla. 1st DCA 1985).
Kirkland v. Harold Pratt Paving, Inc., 518 So.2d 1320, 1324-25 (Fla. 1st DCA 1987). The statute now requires that certain requests be in writing and that the carrier respond within specified time limits to certain requests. § 440.13(3)(d) and (i), Fla.Stat. (1995).
The employer or its carrier can grant a request for alternative care either by authorizing the requested doctor or, if a medical specialty is identified, by authorizing another physician who practices in the same field as the physician requested. See Colace v. Hamlet Estates, Ltd., 573 So.2d 994 (Fla. 1st DCA 1991)(holding adequate alternative treatment offered by specifying orthopedists and neurosurgeons other than those requested); Hillsborough County Sch. Bd. v. Brown, 565 So.2d 867 (Fla. 1st DCA 1990)(hold-ing adequate alternative care offered by naming orthopedic surgeons — who recommended against surgery — other than the orthopedic surgeon requested by the claimant); Hill v. Beverly Enters., 489 So.2d 118 (Fla. 1st DCA 1986)(holding claimant entitled to orthopedist requested when none authorized); Sears, Roebuck Co. v. Viera, 440 So.2d 49 (Fla. 1st DCA 1983)(holding claimant entitled to chiropractor requested when none authorized).
Once an alternative physician capable of dispensing the care requested is authorized, the burden shifts to the employee to obtain an order from the judge of compensation claims before being treated by an unauthorized physician. Even before the amendment, the Hill court noted:
If the employer had offered alternative care, and the employee had objected to such alternative care, the burden would then have been on the employee to obtain an order from the deputy approving a different physician. The employee would have to have done this before obtaining unauthorized treatment.
Hill, 489 So.2d at 121 n. 1. "Where alternative care has been offered, and the parties cannot agree on a treating physician, the claimant must seek a decision through the judge or risk paying the bill.” Colace, 573 So.2d at 997. This requirement is even clearer with the enactment of chapter 93-415, section 17, Laws of Florida. This is not a case where no alternative care was authorized. Cf. Edward L. Nezelek Constr. v. Terlizzese, 9 FCR 328 (1975).

. The present case does not involve an emergency. Under earlier statutes, an exception to the requirement of prior authorization was inferred for emergencies. Compare sections 440.13(2)(e) and (3)(i), Florida Statutes (Supp. 1994). See generally Sieracki v. Pizza Hut, 599 So.2d 678, 679 (Fla. 1st DCA 1992); Teimer v. Pixie Playmates, 532 So.2d 37 (Fla. 1st DCA 1988); Square G. Constr. Co. v. Grace, 412 So.2d 397 (Fla. 1st DCA 1982). But there is no occasion to address the question here. Although Ms. *1241 Schnupp's claim did assert an emergency, the evidence showed otherwise, as the judge of compensation claims found. Nor is this a case in which compensability was denied.

. The procedural requirement that elective surgery be authorized beforehand antedates section 440.13(2)(c), Florida Statutes (1995), which now codifies the requirement. Subsection (2)(c) provides:

. In Robinson v. Howard Hall Co., 219 So.2d 688, 691 (Fla.1969), our supreme court construed the policy behind a predecessor provision to current section 440.13, Florida Statutes, in the initial selection of a physician:
The policy of the statute as we view it is to give the initial right of selection of a treating physician for an injured or sick claimant to employer-carrier, but reserves in claimant the right to dispute such selection for good cause or reason and to seek substitution of that physician by a physician of claimant's choice, pursuant to due determination of the matter by the Judge of Industrial Claims.
We are not concerned here with the initial choice of a single physician to treat the claimant.